Ralph STELL, a minor, by L. S. Stell, Jr., his father and next friend et al., and United States of America, Appellants,

v.

**BOARD OF PUBLIC EDUCATION FOR the CITY OF SAVANNAH AND the COUNTY OF CHATHAM et al., Appellees.**

**BOARD OF PUBLIC EDUCATION FOR the CITY OF SAVANNAH AND the COUNTY OF CHATHAM, Appellant,**

v.

Ralph STELL, a minor, by L. S. Stell, Jr., his father and next friend et al., and United States of America, Appellees.

No. 23724.

United States Court of Appeals
Fifth Circuit.

Dec. 4, 1967.

---

488

B. Clarence Mayfield, E. H. Gadsden, Savannah, Ga., Howard Moore, Jr., Atlanta, Ga:, Jack Greenberg, Charles S. Ralston, New York City, David L. Norman, Brian Landsberg, Attys., Dept. of Justice, John Doar, Asst. Atty. Gen., Donald H. Fraser, U. S. Atty., Joel M. Finkelstein, Atty., Dept. of Justice,

Washington, D. C., James M. Nabrit, III, Henry M. Aronson, New York City, for appellants.

R. Carter Pittman, Dalton, Ga., J. Walter Cowart, Basil Morris, Savannah, Ga., for appellees.

Before TUTTLE, GEWIN, and AINSWORTH, Circuit Judges.

TUTTLE, Circuit Judge:

This is the fourth or fifth appearance of this case in this court, considering both temporary measures and appeals on the merits. We simply do not consider it worth while to take the time to canvass the exact number of times in which we have been called upon to correct the actions of the District Court for the Southern District of Georgia, which have been brought to us for review. The fact that this appeal now aligns the Board of Education of Savannah, Chatham County, Georgia, the Negro plaintiffs and the United States, as intervenor, all as appellants, and Lawrence Roberts and others, minors, by their parents and next friends, white intervenors, as appellees, itself indicates something of the unusual character of this litigation.

In sum, the matter comes down to this: The Negro plaintiffs commenced a suit in 1962 to require the Board of Education to start desegregating the public schools of Savannah and Chatham County, Georgia; the Board, in light of the decisions of this court and of the Supreme Court, notwithstanding the failure of the district court to require any plan to be submitted by it, has been moving towards the currently announced desegregation requirements of this court. See the prior cases at 318 F.2d 425, and 333 F.2d 55. It is plain that progress towards the ultimate total desegregation of the schools of this city and county would have moved much more smoothly, with more certainty, and much more promptly had not the trial court, at the instance of the Roberts group of intervenors, repeatedly entered orders, including an order of dismissal at one stage of the proceedings, completely in conflict with the decisions of this court and of the United States Supreme Court.

Stripped of all nonessential verbiage and technicalities, it is apparent that the sole purpose of the Roberts intervenors, as we stated at 318 F.2d 425, 427, was "to adduce proof as a factual basis for an effort to ask the Supreme Court to reverse its decision in Brown v. Topeka Board of Education [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.]." As we pointed out there, "[t]he [district] court then permitted evidence in support of this approach by the intervenors, and denied the appellants' motion for preliminary injunction solely on the basis of such evidence, which, briefly stated, tended to support the thesis that compliance with the Supreme Court's decision would be detrimental to both the Negro plaintiffs and to white students in the Savannah-Chatham County school system."

We answered this approach both at that time and on the subsequent hearing of the appeal on the merits when at 333 F.2d 55, 61, we said:

"On the application to this court for interim relief in the Savannah case, Stell v. Savannah-Chatham County Board of Education, supra, we noted that the District Court permitted the intervention so that proof might be adduced as to a factual basis for an effort to ask the Supreme Court to reverse its decision in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. We also noted that the District Court was bound by the decision of the Supreme Court in Brown. We reiterate that no inferior federal court may refrain from acting as required by that decision, even if such a court should conclude the Supreme Court erred either as to its facts or as to the law. * * Thus was the Savannah case ended then and there it must end now."

The Supreme Court denied a petition for certiorari, filed on behalf of the Roberts intervenors. Roberts v. Stell, 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344.

Unfortunately, however, although the Board of Education has continued to act

responsibly by attempting to keep abreast of the current decisions of the court with respect to the timing of efforts toward desegregation, notwithstanding the interference with its efforts by the district court, it did not end there. Instead, the trial court held extensive hearings and received evidence seeking to uphold the thesis that Negroes were of a lower standard of "educability" than white students. After further efforts by the Board to file plans with the trial court, and the filing of objections by the plaintiffs and delays on account of the filing of the petition for certiorari to the United States Supreme Court from this court's last decision, (supra), there was finally before the trial court for consideration on April 19, 1966, an updated plan carrying the integration process forward to most of the grades to be effective the following school year, but with no plans to integrate the faculties, and having other deficiencies that need not now be noted. There was also before the trial court a proposed plan submitted by the white intervenors. This proposed plan would require the Board of Education to assign pupils initially in the neighborhood schools and then to permit transfers only on certain conditions, one of which would be "the age and mental qualification of the pupil." The plan also provided expressly in paragraph 14 as follows:

"14. In addition to the criteria hereinbefore set forth, the Defendant Board shall in making or granting assignments and/or transfers take into consideration the similarity of mental qualifications, such as intelligence, achievement, progress rate and other aptitudes, such to be determined upon the basis of Nationally standardized tests. No student shall have the right to be assigned or transferred to any school or class, the mean I.Q. of which exceeds the I.Q. of the student, nor shall a student be assigned or transferred to any school or class, the mean I.Q. of which is less than that of the student, without the consent of the parent or guardian. New students

coming into the system or moving from one district to another shall be assigned to their normal neighborhood school. If a new student is not satisfied with his school assignment, then his case will be handled as that of any other student requesting a transfer."

It also provided as to teachers:

"15. Salaries paid to teachers by said Board shall be based on their mental qualifications, capabilities, merit and competence as determined by the results of Nationally standardized teacher examinations and the judgment of supervisors as to their performance, in which race and color shall play no part."

This proposed plan was substantially adopted by the trial court, over objections of the plaintiffs and the United States government, which had then intervened. The plan submitted by the Board was also rejected.

The Board of Education promptly filed notice of appeal as did the plaintiffs and the United States, all protesting against the power asserted by the district court to require the local board of education to assign students into groupings based upon the "similarity of mental qualifications such as intelligence, achievement, progress rate and other aptitudes." Objected to also were the provisions in Section 15 of the order directing how the board should pay salaries of teachers.

Pending the appeal of this case, this court decided United States of America and Linda Stout et al. v. Jefferson County Board of Education et al., 5 Cir., 372 F.2d 836. (Later affirmed with slight modifications by the court en banc. 380 F.2d 385.) The opinion in that case was carefully arrived at after this court had struggled for a decade to solve problems of school desegregation on a case-to-case basis, without enough having been accomplished to satisfy the requirements of the Supreme Court's decision in Brown v. Topeka Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and without sufficient uniformity from

school district to school district. We attached a decree as appendix A to that opinion as to which we said:

"The provisions of the decree are intended, as far as possible, to apply uniformly throughout this circuit in cases involving plans based on free choice of schools." 372 F.2d 836, 894.

We also said, however:

"Schools boards, private plaintiffs and the United States may, of course, come into court to prove that exceptional circumstances compel modification of the decree."

Following the publication of this opinion of our court and pending this appeal, the appellant Board of Education filed a new plan as its proposal to comply with the requirements set out in *Jefferson*.

Thus it is that when this case was argued before us, we had before us several so-called "plans." We had the plan decreed by the trial court over the objection of the School Board, the plaintiffs and the United States, and from which all three appealed. We had the plan of the Board of Education which the district court disallowed and from which order of disallowance the Board appealed. We then had the plan proposed by the Board pending appeal and which the Board contended was in substantial compliance with the *Jefferson* decree. Then, of course, we had the *Jefferson* decree itself, which this court, acting en banc, has said is to be the guiding model for all to follow, barring "exceptional" circumstances.

 We can easily dispose of the plan actually ordered into effect. The order of the trial court directing the Board of Education to assign its pupils according to intelligence tests was beyond the power of the court. No person has the constitutional right to attend schools in classes which are divided ac-

cording to ability or intelligence quotients. The trial court simply had no power to direct any such plan into effect. Neither, of course, did it have the power to direct that teachers be promoted or paid in accordance with their intelligence. These are matters that are strictly left for the administrative body concerned. There is no constitutional authority for federal courts to impose their ideas of school management on boards of education as to these matters.[1] Moreover, there were other serious defects in the court's plan which we have heretofore found to be invalid. It has been self evident from the date the order was entered that it could not stand in light of previous decisions of this court. It must, therefore, be set aside.

The Board of Education now, of course, abandons its plan which it had submitted to the trial court prior to that court's erroneous judgment of April 19, 1966. Thus, we are brought down to a consideration of the Board's plan which has since been submitted to carry out the duty that remains with it to comply with all of the legal requirements as delineated in this court's decision in the *Jefferson County* case.

In view of the late filing of the plan which the appellant Board requested this court to approve in light of *Jefferson*, we asked all parties to comment on that plan and to point out the areas in which there might be significant differences between it and the proposed decree in the *Jefferson* case, supra. The Board of Education has filed its brief in which it undertakes to point out that in all substantial respects the spirit of *Jefferson* has been met and that any changes are only appropriate adjustments adapted to the needs of this particular Board. We need look no further than the brief of the United States as intervenor to ascertain that it also feels that this proposed plan is a substantial move towards

---

[1]. The argument by appellees that this court's prior statement that there was no constitutional bar to a board's assignment to schools according to standards of aptitude warranted the district court's *requiring* this to be done is sheerest sophistry.

the requirements of *Jefferson*. The government's brief says:

"That plan follows in its main outline and in many particulars the Jefferson County decree. We believe that it is, taken as a whole, a good plan, well suited to the individual needs of the Savannah Chatham School system, but that some of its deviations from Jefferson County are unwarranted and others, while warranted, require refinements."

The brief of the individual appellants also says

"Preliminarily, it should be pointed out that the majority of the sections of the proposed plan of the school board comply to the letter with the decree set out by this court in its en banc decision in the United States of America, et al, v. Jefferson County, et al. Appellants, of course, agree that the unchanged sections should be entered."

Appellants and the United States both then set forth the sections, according to the numbering and lettering of the *Jefferson* decree which have been altered by the school board in its proposed plan.

We have carefully compared the new proposed plan submitted by the Board with this court's former decree in the *Jefferson* case, and have considered the objections filed on behalf of the appellants and the United States to any changes between the two. Bearing in mind the great benefit to all concerned in maintaining as high a degree of uniformity as is possible in the plans as finally approved for the many school districts in this circuit, we, nevertheless, accept such modifications in the precise language of the *Jefferson* decree to meet the peculiar circumstances of the school system as are not objected to by either the individual appellants or the intervenor. We also are agreeable to the acceptance of language in this plan that elaborates to some extent on general statements contained in the *Jefferson* decree.

■ There are several proposed changes, however, which we think should not be allowed, since they deal with matters of substance and policy. The first of these is the objection by the Savannah Board to the provision that a school child who has reached the age of fifteen or who is exercising his choice for the ninth or higher grade is to make the initial choice of school, rather than his parents, subject to being overruled by the parents. We consider this a valid and important part of the *Jefferson* decree.

Another such matter is that dealing with remedial programs under Section VI, paragraph (b), of the *Jefferson* decree and of the Savannah plan. We see no reason to modify the requirements that are set out in *Jefferson* as to carrying out remedial measures by limiting that requirement to funds supplied by the United States.

Finally, there is the matter of the use of school zones by the Chatham Board. While the use of school zones in each of which there are at least two schools available, is not *per se* invalid, it is not possible for this court to give its stamp of approval without further opportunity for hearings on the school zones as actually established and as now operating. For this reason we have, as suggested by the intervenor United States Government, added a paragraph X to the plan which we consider fully takes care of this matter without in any way impairing the operation of the school board's plan as a whole.

Specifically, then, this court sets out below a plan called "Desegregation Plan for the Board of Education for the City of Savannah and the County of Chatham, Georgia." Upon notice from the Board to the United States District Court for the Southern District of Georgia that it has embodied the modifications to its plan filed in this court on September 27, 1967, as are made apparent by the plan outlined below, we hold that that plan shall be the plan of desegregation to be followed by the Board of Public Education for the City of Savannah and the County of Chatham, without the necessity for any further order by the district court. In default of such accept-

ance by the Board, any other party to the litigation may file a notice to that effect with the Clerk of this court, and request such other and further order as may be necessary.

We have given further consideration to the motion of the appellants that the Roberts intervenors be dismissed as parties to this litigation. On a previous appearance of this case, a panel of this court, doubtless out of an abundance of caution lest any party be denied an opportunity to be heard, denied a similar motion. Now much additional fruitless litigation has followed. However it is apparent that with today's action by this court any possibility for future delays or impediments to the final solution of the problems of the public schools in Savannah and Chatham County are remote indeed. We will, therefore, not rule differently now. We do consider it to be in accord with proper legal principles to assess the costs of this appeal and the costs of the proceedings in the district court which have been incurred by any party in connection with the efforts by the Roberts intervenors to establish the theory on which they proceeded in the case to be taxed to the Roberts intervenors. The parties may submit to the district court their respective bills of costs to carry out this part of the order for the approval of the trial court in allocating the costs as here provided for.

The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion. The judgment will issue forthwith. See Rule 32 of this court.

DESEGREGATION PLAN FOR THE BOARD OF PUBLIC EDUCATION FOR THE CITY OF SAVANNAH AND THE COUNTY OF CHATHAM (GEORGIA)

I.

SPEED OF DESEGREGATION

As to students, The Board of Public Education for the City of Savannah and the County of Chatham has been in process of desegregating its system under judgments of the Fifth Circuit Court of Appeals since September, 1962, having desegregated all grades in its system commencing with the school year 1966–1967; and, as to faculty and administrative staff, in part for the school year 1966–1967. Its desegregation program has been based largely upon a Freedom of Choice Plan, and it intends to continue with such Plan for the school years 1968–1969, and thereafter; provided desegregation can be legally accomplished by this Plan; if not, then any of the parties in this action may seek Court approval of a Plan which will accomplish such objective. Its program contemplates, and it is actually using, attendance areas established which it will continue to use subject to the provisions of Paragraph X of this Plan. So that students may exercise a free choice, at least two schools will be located in each attendance area. No school will be located in more than one attendance area.

II.

EXERCISE OF CHOICE

The following provisions shall apply to all grades:

(a) WHO MAY EXERCISE CHOICE. A choice of schools may be exercised by a parent or other adult person serving as the student's parent. A student may exercise his own choice if he (1) is exercising a choice for the ninth or a higher grade, or (2) has reached the age of fifteen at the time of the exercise of choice. Such a choice by a student is controlling unless a different choice is exercised for him by his parent or other adult person serving as his parent during the choice period or at such later time as the student exercises a choice. Each reference in this decree to a student's exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult, or by the student himself.

(b) ANNUAL EXERCISE OF CHOICE. All students shall be required to exercise a free choice of schools annually.

■ (c) CHOICE PERIOD. The period for exercising choice shall commence February 1, 1968, and end with the last day of February, 1968, and in subsequent years shall be the entire month of February preceding the school year for which the choice is to be exercised. No student or prospective student who exercises his choice within the choice period shall be given any preference because of the time within the period when such choice was exercised.

■ (d) MANDATORY EXERCISE OF CHOICE. A failure to exercise a choice within the choice period shall not preclude any student from exercising a choice at any time before he commences school for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who has not exercised his choice of school within a week after school opens shall be assigned to the school nearest his home where space is available under standards for determining available space which shall be applied uniformly throughout the system.

(e) PUBLIC NOTICE. On or within a week before the date the choice period opens, the defendants shall arrange for the conspicuous publication of a notice describing the provisions of this decree in the newspaper most generally circulated in the community. The text of the notice shall be substantially similar to the text of the explanatory letter sent home to parents. Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations located in the community. Copies of this decree shall be posted in each school in the school system and at the office of the Superintendent of Education.

(f) MAILING OR PERSONAL DELIVERY OF EXPLANATORY LETTERS AND CHOICE FORMS. On the first day of the choice period one of two methods may be employed in notifying parents or other adult persons serving as parents, (1) distributing by first class mail an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the Board) of each student, together with a return envelope addressed to the Superintendent, or (2) by delivering such explanatory letters and choice forms to the student with adequate procedures to insure the delivery of the notice and the exercise and return of the signed choice form.

(g) EXTRA COPIES OF THE EXPLANATORY LETTER AND CHOICE FORM. Extra copies of the explanatory letter and choice form shall be freely available to parents, students, prospective students, and the general public at each school in the system and at the office of the Superintendent of Education during the times of the year when such schools are usually open.

(h) CONTENT OF CHOICE FORM. Each choice form shall set forth the name and location and the grades offered at each school and may require of the person exercising the choice the name, address, age of student, school and grade currently or most recently attended by the student, the school chosen, the signature of one parent or other adult person serving as parent, or where appropriate the signature of the student, and the identity of the person signing. No statement of reasons for a particular choice, or any other information, or any witness or other authentication, may be required or requested, without approval of the Court.

(i) RETURN OF CHOICE FORM. At the option of the person completing the choice form, the choice may be returned by mail, in person, or by messenger, to, (1) the school the student is then attending, (2) the school chosen by the student, or, if not convenient, then (3) to any other school in the system, or (4) to the office of the Superintendent.

(j) CHOICES NOT ON OFFICIAL FORM. The exercise of choice may also be made by the submission in like manner of any other writing which contains the name of the student, his residence and age, the school he is attending, the

school chosen, and is signed as heretofore required in this Plan.

(k) CHOICE FORMS BINDING. When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and may not be changed except in cases of parents making different choices from their children under the conditions set forth in paragraph II(a) of this decree and in exceptional cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student.

(l) PREFERENCE IN ASSIGNMENT. In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of Court in extraordinary circumstances, no choice shall be denied for any reason other than overcrowding. In case of overcrowding at any school, preference shall be given on the basis of the proximity of the school to the homes of the students choosing it, without regard to race or color. Standards for determining overcrowding shall be applied uniformly throughout the system.

(m) SECOND CHOICE WHERE FIRST CHOICE IS DENIED. Any student whose choice is denied must be promptly notified in writing and given his choice of any school in his attendance area serving his grade level where space is available. The student shall have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.

(n) TRANSPORTATION. Where transportation is generally provided, buses must be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing either the formerly white or the formerly Negro school nearest his residence must be transported to the school to which he is assigned under these provisions, whether or not it is his first choice, if that school is sufficiently distant from his home to make him eligible for transportation under generally applicable transportation rules.

(o) OFFICIALS NOT TO INFLUENCE CHOICE. At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, or any student, in the exercise of a choice or favor or penalize any person because of a choice made. If the defendant school board employs professional guidance counselors, such persons shall base their guidance and counselling on the individual student's particular personal, academic, and vocational needs. Such guidance and counselling by teachers as well as professional guidance counsellors shall be available to all students without regard to race or color.

(p) PROTECTION OF PERSONS EXERCISING CHOICE. Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior. The school board shall not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this decree. If officials of the school system are not able to provide sufficient protection, they shall seek whatever assistance is necessary from other appropriate officials.

## III.

### PROSPECTIVE STUDENTS

Each prospective new student shall be required to exercise a choice of schools before or at the time of enrollment. All such students known to defendants shall be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon there-

after as the school system learns that he plans to enroll. Where there is no pre-registration procedure for newly entering students, copies of the choice forms shall be available at the Office of the Superintendent and at each school during the time the school is usually open.

## IV.

### TRANSFERS

(a) TRANSFERS FOR SPECIAL NEEDS. Any student who requires a course of study not offered at the school to which he has been assigned may be permitted, upon his written application, to transfer to another school which offers courses for his special needs.

(b) TRANSFERS TO SPECIAL CLASSES OR SCHOOLS. If the defendants operate and maintain special classes or schools for physically handicapped, mentally retarded, or gifted children, the defendants may assign children to such schools or classes on a basis related to the function of the special class or school that is other than freedom of choice. In no event shall such assignment be made on the basis of race or color or in a manner which tends to perpetuate a dual school system based on race or color.

## V.

### SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

▮ No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to longstanding, non-racially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendants shall be conducted without regard to race or color.

## VI.

### SCHOOL EQUALIZATION

(a) INFERIOR SCHOOLS. In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this paragraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned on the basis of freedom of choice. By November of each year, defendants shall report in writing to the Clerk of the Court pupil-teacher ratios, pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization of such schools.

▮ (b) REMEDIAL PROGRAMS. The defendants shall provide remedial education programs which permit students attending or who have previously

attended all-Negro schools to overcome past inadequacies in their education.

## VII.

### NEW CONSTRUCTION

The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.

## VIII.

### FACULTY AND STAFF

(a) FACULTY EMPLOY-MENT. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on the desegregated faculty. The Board will continue positive and affirmative steps to accomplish the desegregation of its school faculties and to achieve substantial desegregation of faculties in its schools for the 1968–69 school year notwithstanding teacher contracts for 1968–69 may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in school.

(b) DISMISSALS. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without out consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

(c) PAST ASSIGNMENTS. The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

## IX.

### REPORTS TO THE COURT

(1) REPORT ON CHOICE PERIOD. The defendants shall serve upon the opposing parties and file with the Clerk of the Court on or before June 1, 1968, and in each subsequent year on or before June 1, a report tabulating by race the number of choice applications and transfer applications received for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report shall also state any reasons relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.

In addition, the report shall show the percentage of pupils actually transferred or assigned from segregated grades or to schools attended predominantly by pupils of a race other than the race of the ap-

plicant, for attendance during the 1967–68 school year, with comparable data for the 1966–67 school year. Such additional information shall be included in the report served upon opposing counsel and filed with the Clerk of the Court.

(2) REPORT AFTER SCHOOL OPENING. The defendants shall, in addition to reports elsewhere described, serve upon opposing counsel and file with the Clerk of the Court within 15 days after the opening of schools for the fall semester of each year, a report setting forth the following information:

(i) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any action taken by the defendants on his request and the reasons therefor.

(ii) The number of faculty vacancies, by school, that have occurred or been filled by the defendants since the order of this Court or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

(iii) The number of students by race, in each grade of each school.

## X.

### ATTENDANCE ZONES

 The school board may continue to use attendance zones as described in Paragraph I. Such zones should be constituted, to the extent consistent with the proper operation of the school system as a whole, with the objective of eradicating the vestiges of the dual system. The school board shall, within a month of the entry of this decree, file with the Clerk of the Court and serve upon the parties maps showing the zones and the schools serving each zone, and shall similarly file and serve any proposed changes at least a month prior to the date said changes are scheduled to take place. The district court will, prior to such changes becoming effective, upon motion of any party, hold a hearing to determine whether the zones or the changes therein meet the requirements set forth herein.