**UNITED STATES of America**

**v.**

**BOARD OF EDUCATION OF LINCOLN COUNTY.**

**Joseph COBB et al.**

**v.**

**J. R. FREEMAN et al.**

**Civ. A. Nos. 1400, 1420.**

United States District Court
S. D. Georgia,
Augusta Division.

July 9, 1969.

See also D.C., 295 F.Supp. 1041.

Michael J. Hoave, Washington D. C., for United States.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., John Ruffin, Jr., Augusta, Ga., Jack Greenberg, New York City, for plaintiffs.

E. Freeman Leverett, Elberton, Ga., for defendants.

## ORDER

LAWRENCE, Chief Judge.

These two actions have been respectively brought by the United States Attorney General, pursuant to 42 U.S.C. 2000c–6, and by certain Negro school children and their parents, as a class, seeking an injunction against the maintenance of a dual school system in Lincoln County, Georgia.

The main defendant in the two desegregation cases is the Lincoln County Board of Education, a five-man board created pursuant to law which has jurisdiction over the public schools in that County.

An evidentiary hearing was held at Augusta on April 7, 1969, at which the principal witness was the Superintendent of Schools, J. R. Freeman. The record has been transcribed and able briefs filed by both sides.

## FINDINGS OF FACT

1. Lincoln County is one of 159 counties in the State. According to the 1960 census it has a total population of 5906, consisting of 3012 white and 2894 Negro citizens. The County ranks as No. 140 in population in the State. Lincolnton, the only incorporated city in the county, has a population of approximately 1500. The county is rural in nature, the production of saw timber and pulpwood being the principal business activity.

2. The median school years completed for the county as a whole is 7.8 and for the nonwhite population, 5 years. See United States Census of Population, 1960, Georgia, General Social and Economic Characteristics, PC 11, 12C (Ga.)

3. The Lincoln County school system consists of two 12-grade schools. West Side is attended solely by Negro students. Lincolnton is a predominantly white school. Both are located in the city limits of Lincolnton less than two miles apart. Although the total white population of the County exceeds the total Negro population, the school population is 57.9% Negro. For the school year 1968–69, the pupils were distributed, as follows:

| White Elementary | 386 | White High School | 312 |
| Negro Elementary | 645 | Negro High School | 320 |

4. West Side High and Elementary (1–12) has an all Negro student body. Lincolnton High and Elementary (1–12) has a predominantly white student body.

5. Since January, 1966 students in Lincoln County have selected the school they attend pursuant to a "freedom of choice" program. According to the Superintendent, choice forms were sent out and notices were published in January, 1966 and also in the fall of 1967. Although no choice forms were sent out in the fall of 1968 in anticipation of the school year just completed (1968–1969),

the Superintendent says that the students were permitted to exercise their choices as before.

6. "Freedom of Choice" has produced the following results in the way of integration:

| School Year | Enrollment | | Number of Students Enrolled in a School of the Opposite Race | | Percentage of Students Enrolled in a School of the Opposite Race | |
|---|---|---|---|---|---|---|
| | Negro | White | Negro | White | Negro | White |
| Prior to January, 1966 | N/A | N/A | 0 | 0 | 0 | 0 |
| Spring term, 1966 | N/A | N/A | 7 | 0 | N/A | 0 |
| 1966–1967 | 1011 | 696 | 5 | 0 | .4% | 0 |
| 1967–1968 | 1009 | 715 | 5 | 0 | .4%' | 0 |
| 1968–1969 | 974 | 690 | 7 | 0 | .7% | 0 |

7. No white student in Lincoln County has ever attended the Negro school.

8. The Board plans to send out choice forms and to publish notices in the newspaper for the 1969–70 school year. Seven Negro students attended Lincolnton school in 1966; 6 in 1967–68, and 7 in 1968–69. The system has 36 Negro teachers. All of them teach at West Side. It has 32 white teachers, of whom 31 teach at Lincolnton and one at West Side.

9. Federal funds were cut off in January, 1968. Prior to that action, the Board received assistance under Title I in the approximate amount of $108,000 per year. Except for an initial summer program, all of these funds were used at the West Side school for the benefit of the Negro students in connection with free lunches, band instruments, library rooms, and the foreign language program. The system also used the Federal funds to furnish free lunches to approximately 500 Negro students. In 1966, 730 Negro students qualified in the low income category under federal law and 97 white students.

10. There has been practically no faculty desegregation in the schools of Lincoln County. The following chart shows the Board's progress in that area:

| School Year | Total Faculty | | Teachers Assigned to Faculties Where Their Race is a Minority | |
|---|---|---|---|---|
| | Negro | White | Negro | White |
| 1967–1968 | 35 | 30 | 0 | 1 |
| 1968–1969 | 36 | 32 | 0 | 1 |

*School Board's Contentions*

In the opinion of Superintendent Freeman, neither a zoning nor pairing plan will work in Lincoln County. The reason he advanced is that the white pupils will withdraw from school and leave the school with only Negro students attending same. He testified that "freedom of choice is more promising in effectiveness with respect to meaningful and immediate progress toward disestablishing segregation * * *." Mr. Freeman contends that it is not practical to pair the two schools because the phys-

ical facilities are not designed to permit utilization on this basis.

In addition to the evidence adduced at the Augusta hearing, the defendants took depositions from two college professors of psychology, Dr. R. T. Osborne and Dr. Frank C. J. McGurk. The former is a professor of psychology at the University of Georgia and Director of Testing Evaluation. In January, 1969 at the request of Superintendent Freeman, he administered the California tests of mental maturity, reading and arithmetic to all students in the Lincoln County school system. The tests showed that the mean IQ in the predominantly white school ranges from a low of 97.1 in the Fifth Grade to a high of 106.1 in the Eleventh Grade. The comparable figures for the Negro West Side School are 62 and 76.6. Only 3 grades at West Side have mean IQ's above 75 which is the point at which students are deemed entitled to compensatory and remedial instruction as "exceptional children." The results of the tests indicated that the "overlap" between Negro and white students would affect only 41 pupils in the entire school population.

Dr. Frank C. J. McGurk, Professor of Psychology at the University of Alabama, reviewed the test results at the two schools. He testified that the test scores at the West Side School are much lower than those at the Lincolnton School. He noted that children in the former performed more poorly in the nonlanguage part of the intelligence test than they did in the language section. In his opinion, neither pairing nor zoning would be practical for the Lincoln County system. He testified that the best plan of desegregation would be one based on a "tracking" system, using mental maturity scores. Dr. McGurk expressed the opinion that approximately 75% of a student's performance is attributable to heredity. He said that socio-economic status does not affect test scores very much. In support of his conclusion, he pointed out that the Negro children performed more poorly in the nonlanguage parts of the mental maturity tests than they did upon the verbal parts, which he thought indicated the invalidity of the "cultural" or environmental hypothesis.

### Defendants' Proposed Plan of Desegregation

The Board of Education proposes that it be permitted to implement a plan of desegregation. The plan which is outlined in the brief of defendants does not utilize the "tracking" system mentioned above. It provides:

"(1) The system shall continue freedom of choice for the 1969–70 school year, except that 75 students from West Side will be transferred to Lincolnton school at the beginning of school in September, 1969, the transferred students to be selected according to the available space in each grade at Lincolnton.

"(2) The Board shall transfer 3 white teachers to West Side and 3 Negro teachers to Lincolnton, effective September, 1969.

"(3) The transportation program will be revised so that all duplication and overlapping of routes will be eliminated wherever possible.

"(4) All French classes for the system will be taught at the West Side School for the 1969–70 school year, and the Board will arrange for pupils to be transferred from Lincolnton to West Side.

"(5) The Board of Education has approximately $100,000 in capital outlay funds available from a prior bond issue. The Board also proposes immediately to float a local bond issue in an amount between $100,000 and $200,000, which will thereby entitle the Board to approximately $400,000 in matching state funds under MFPE. These funds will be used to construct a modern high school building for the entire county, for grades 9–12 or 10–12. Upon completion, all high school students in the County will attend

this school; the existing Lincolnton school will be converted into a Junior High, and West Side will be converted into a kindergarten and Elementary school. It is hoped that such a program could be completed by September, 1970 or early in 1971.

"The above plan is based upon realization by the Board that first, existing buildings are not suitable for utilization on a pairing basis, and second, the interim steps above set forth hopefully would create an atmosphere which would avoid massive white withdrawal."

I reserve comment on the Board's plan until later in this order.

*Proposed Desegregation Plan of Plaintiffs*

Plaintiffs submit that the two schools in Lincoln County should be reorganized so that the West Side School would accommodate all of the children in the county attending grades 1–6 and the Lincolnton School would serve all children in grades 7–12. Based on figures for the school year 1968–1969 this reorganization would result in a decrease in the pupil load at the West Side School of 48 and an increase of 52 students at the Lincolnton School.

The resulting grade structure and racial composition of the student body would be

| Grades | West Side N | West Side W | Grades | Lincolnton N | Lincolnton W |
|---|---|---|---|---|---|
| 1 | 81 | 61 | 7 | 82 | 49 |
| 2 | 84 | 55 | 8 | 57 | 52 |
| 3 | 79 | 54 | 9 | 67 | 60 |
| 4 | 74 | 46 | 10 | 67 | 62 |
| 5 | 86 | 46 | 11 | 48 | 62 |
| 6 | 88 | 51 | 12 | 40 | 57 |
| Total | 805 | | Total | 707 | |

Attached to defendants' brief is an HEW chart which furnishes statistics as to racial enrollments in schools in St. Louis, Gary, Washington and Chicago in the school year 1967–68. In St. Louis out of 177 schools 30 were all-white and 59 all-Negro. In Gary which has 44 schools there were 16 all-white and 5 all-Negro. Washington, D.C. has 189 schools of which 69 are all-Negro. Chicago, with a total of 528 schools, has 101 that are all-Negro and 127 that are all-white. In Chicago there are 182 schools with all-white faculties.

## CONCLUSIONS OF LAW

The defendants' present method of student assignment is clearly deficient according to judicial exposition of the Fourteenth Amendment. See Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education of the Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Adams v. Mathews, 5 Cir., 403 F.2d 181; Davis v. Board of School Commissioners of Mobile County, 414 F.2d 609 (C.A. 5, June 3, 1969); Hall v. St. Helena Parish School Board, (C.A. 5, No. 26450 and 27303, May 28, 1969); Anthony v. Marshall County Board of Education, 409 F.2d 1287 (C.A. 5, April 15, 1969); United States v. Indianola Municipal Separate School District, 410 F.2d 626 (C.A. 5, April 11, 1969); Henry v. Clarksdale Municipal Separate School District, 5 Cir., 409 F.2d 682; United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (C.A. 5, Feb. 4, 1969); Davis v. Board of School Commissioners, 414 F.2d 609 (C.A. 5, June 3, 1969).

In Adams v. Mathews, *supra*, the Court of Appeals for the Circuit said:

"If in a school district there are still all-Negro schools or only a small frac-

tion of Negroes enrolled in white schools or no substantial integration of faculties and school activiteis then, as a matter of law, the existing plan fails to meet constitutional standards as established in *Green*."

■ The duty to desegregate dual school systems includes the constitutional obligation to take *affirmative* action to redistribute and assign faculties and staff members so that no school can be racially identified as tailored for students of any particular race. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (June 2, 1969); United States v. Board of Education of City of Bessemer, 396 F.2d 44 (C.A. 5, 1968); United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5, 1966) Aff'd *en banc* 380 F.2d 385 (C.A. 5, 1967); Hall v. St. Helena Parish School Board (C.A. 5, No. 26450, 27303, May 28, 1969).

It is clear, under the evidence in this case, that three years operation of the School Board's "Freedom of Choice" has not produced sufficient desegregation of students or faculty to satisfy, even remotely, the standards set forth in these and many other decisions. The defendants continue to operate and maintain an all-Negro school, West Side High and Elementary, and only .7% of the Negro student population attends the white school.

■ The decisions of the Fifth Circuit do not permit me to consider the testimony of Dr. Osborne or Dr. McGurk in respect to the tests claimed to illustrate the performance gap between white and Negro scholastic achievement. See Stell v. Savannah-Chatham County Board of Education, 318 F.2d 425 (C.A. 5, 1963), 333 F.2d 55 (C.A. 5, 1964) and Stell v. Board of Public Education, 387 F.2d 486 (C.A. 5, 1967); Jackson Municipal Separate School District v. Evers, 357 F.2d 653 (C.A.5, 1966); and United States v. Jefferson County Board of Education, 372 F.2d 836 at 848, 849 (C.A.5, 1966)

■ Under latter-day Fourteenth Amendment interpretation, scholastic aptitude means nothing. Total integration of schools, regardless of consequences to the system, is all that counts. The higher courts apparently look no further. If a lower court were to do so, it would be met by the argument that it is impermissible to allow the school boards to assert the educational results of past discrimination as justification for the continuation thereof. Cf. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Gaston County, North Carolina v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309.

■ The strong possibility that the public school system in Lincoln County will consist only of Negro students a few years from now is inconsequential to the courts. In United States v. Jefferson County Board of. Education, 380 F.2d. 385, 416 (C.A.5, 1967), a dissenting Judge observed:

"A good example of the problems to be encountered in eliminating the dual school system is to be seen in the Taliaferro County, Georgia, school system. See Turner v. Goolsby, S.D.Ga.1965, 255 F.Supp. 724, for background. There were only two schools in the system and the board desegregated, effective in September, 1966, on the basis of converting the white school into an elementary school and the Negro school into a high school. A perfect racial balance would be accomplished under the plan. In 1965 there were approximately 600 Negro children and 200 white children enrolled in the system. The records of the Georgia State Department of Education as of January 19, 1967, indicate that there are now 527 Negro students enrolled in the Taliaferro County School System and no white students."

In Anthony v. Marshall, *supra*, the same Court said:

"In declining to order discontinuance of the 'freedom. of choice' plans and substitute therefor pairing or zoning, the District Court said that it based

its ruling in part on the fact that white students would flee from public schools where Negro pupils heavily preponderated and that there would be a 'wholesale withdrawal' by white students. Such a conclusion is precluded by the clear mandate of the Supreme Court in Green."

In the recent case of United States of America v. Jefferson County and United States v. Board of Education of the City of Bessemer (C.A. 5, Nos. 27444, 27445 June, 1969) a footnote states, "There was testimony that white students would not attend formerly Negro schools. This is not a legal argument. Cf. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)."

▇ School boards have the affirmative duty to take whatever steps may be necessary to convert to a unitary system in which discrimination is eliminated. *Green, supra*; United States v. Indianola School District, *supra*. The Fifth Circuit Court of Appeals has said, "the rule has become: The later the start, the shorter the time allowed for transition." Lockett v. Board of Education of Muscogee County, 342 F.2d 225 (C.A. 5, 1965).

The Board's proposed plan contemplates continuance of "Freedom of Choice" as modified by the transfer of 75 Negro students to the white school in September, 1969. Such transferees are to be selected by criteria which the proposed plan does not make at all clear. The West Side School will continue to be all-Negro. The plan fails to provide for any substantial increase in faculty desegregation. It is true that the plan envisions a future bond issue the proceeds of which will be used to erect a modern high school. It would be attended by *all* students in grades 9–12 or 10–12. Lincolnton School would become a junior high and West Side an elementary school.

At best, this is speculative. Bond issues do not always pass. Further, I cannot allow what may happen at some indefinite future date to delay until tomorrow what the higher courts tell me must be done today.

One need not be versed in the fatidic art or occult sciences to divine what the Fifth Circuit Court or the Supreme Court would do were I to approve the plan. In cicadian and circadian refrain, their mandates beat a tom-tom *ostinato* of "affirmative duty," "unitary, nonracial system," "failure of freedom of choice," "wiped out root and branch," "meaningful and immediate progress," "not tomorrow but now."

The truth is freedom of choice is *never* going to work in Lincoln County in the manner the Fourteenth Amendment is interpreted to require. Not a single white student has chosen to attend a Negro school and this has been true of every other county in the Southern District of Georgia. At least, that is true as observed by me in the school cases that have come before this Court. Out of 974 colored students in Lincoln County only 7 elected to attend the white school last year, less than 1% of the total Negro school population. The usual claim of fear or harassment as a deterrent to choice by colored students to attend predominantly white schools is advanced. But the assertion is not supported by the evidence. The failure of freedom of choice to produce significant integration stems, it would seem, from deeper causes.

▇ But this is beside the point. My duty under the law and facts is crystal clear. A plan under which all-Negro schools remain and where only a small fraction of colored students enroll in white schools and where there is token integration of faculties and none of school activities fails to meet constitutional standards. Adams v. Mathews, *supra*. Nor is the Board's proposed plan legally acceptable. It is not approved. The defendants must be, and are, enjoined from operation of the dual school system in Lincoln County. Counsel will

submit an appropriate order in that respect.

However, this does not resolve matters. What plan is to be adopted? And when shall it go into effect? In Adams v. Mathews, *supra* (at p. 189 of 403 F.2d) the Court of Appeals put all school boards in the Fifth Circuit on notice that all-Negro schools "must be integrated or abandoned by the commencement of the next school-year," which starts this September. Time is running out. The preparation of a transcript of evidence, which the Government desired, delayed this matter for more than two months. The Government's brief did not reach me until June 21st and as late as June 25th counsel were still presenting written arguments. The delay is not of my doing, at least not all of it.

Plaintiffs' counsel conceive the problem as requiring nothing more on my part than blanket approval of the plan of desegregation recommended by the Government. It is not quite that simple. I feel that the Court and Board need expert, professional counsel and assistance in formulating a workable and legal plan. Provision for technical assistance to school boards is found in the Civil Rights Act of 1964 (42 U.S.C. § 2000c–2). I deem it expedient to obtain, through the written request of the Board, the professional help that this section affords.

The Board of Education of Lincoln County is directed forthwith to request the Office of Education, H.E.W., for assistance in development of a plan and will furnish information to it covering existing and proposed methods of operation, etc. Prompt response by H.E.W. to the request is solicited by the Court. If possible, I would like to have recommendations in the hands of the defendants and myself on or before August 5th.

After such recommendations are received from H.E.W. I will render a final judgment. I desire to do so not later than August 11th. Opportunity to be heard in that connection will be accorded the parties.