**UNITED STATES of America,
Plaintiff,**

v.

**SCHOOL DISTRICT OF the CITY
OF JENNINGS et al.,
Defendants.**

**No. 73C 259(4).**

United States District Court,
E. D. Missouri, E. D.

Sept. 11, 1975.

As Corrected Sept. 16, 1975.

Donald J. Stohr, U. S. Atty., St. Louis, Mo., Daniel Rinzel and J. Stanley

Pottinger, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

Ziercher, Tzinberg, Human & Michenfelder, by Erwin Tzinberg, Clayton, Mo., for defendants.

## OPINION

NANGLE, District Judge.

In this action the United States has alleged that the School District of the City of Jennings in St. Louis County, Missouri ("Jennings District" or "District"), the District's Superintendent, and the members of its Board of Education pursue a pattern and practice of discrimination against black applicants for employment in faculty and staff positions with the District. Violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and of the Fourteenth Amendment to the Constitution of the United States are alleged. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345 and 42 U.S.C. § 2000e–6(b).

The claims of the United States fall into four categories: (1) The District has failed and refused to hire black applicants as well or better qualified than the white applicants subsequently hired for available faculty and staff positions. (2) The District has failed and refused to recruit blacks for employment while whites are recruited. (3) The District has failed and refused to utilize objective, nondiscriminatory selection procedures for the employment of faculty and staff. (4) The District has failed and refused to take affirmative action to overcome the effects of past racially discriminatory policies and practices. The action has been tried to the Court sitting without a jury.

The Jennings District is located in the Northern portion of St. Louis County, Missouri, and borders the City of St. Louis. The residents of the District are predominantly white. However, the areas immediately to the South and to the East of the District have significant black populations.

The Jennings District is an agency of the State of Missouri which provides public education to school children residing within its boundaries. The named defendant Board of Education members and the defendant Superintendent, under the supervision of the Board, are responsible for the operation of the Jennings District.

The District operates six schools including three elementary schools offering grades kindergarten through 6, two junior high schools offering grades 7 through 9, and one senior high school offering grades 10 through 12. An assistant superintendent for elementary education supervises the elementary schools; an assistant superintendent for secondary education supervises the two junior high schools and the senior high school. Both assistant superintendents are responsible to the Superintendent.

Prior to 1954, the Missouri Constitution required that public schools be segregated on the basis of race. The Jennings District, however, maintained no black schools. Between 1925 and 1957 only three black school-age children resided within the District. They resided there only during the 1925–1926 school year. During that year they were transferred to the nearby Ferguson school district which maintained a school for black students.

In 1967 the first black family in recent times moved into the Jennings District and in that year the first black student enrolled with the District. In January, 1969, 7 of the District's total enrollment of 3,098 students (approximately .2%) were black; in October, 1970, 34 of the District's total of 3,217 students (approximately 1.05%) were black; in October, 1972, 109 of the District's 3,044 students (approximately 3.6%) were black.

From 1954 to 1972 the District employed no black persons[1] in any capaci-

I. Between 1961 and 1966 the District employed as a teacher a dark skinned native of India. This person is now employed by the District as a substitute teacher.

ty. During this period 228 teachers were hired. In 1972 a black teacher was hired; in 1973 two more black teachers were hired.

According to the 1970 United States Census,

a) the St. Louis Standard Metropolitan Statistical Area [2] ("SMSA") has a total population of 2,363,013 of which 378,748 (16%) are black;

b) the total population of the City of St. Louis and St. Louis County is 1,573,587 of which 299,847 (19.1%) are black;

c) of approximately 19,425 elementary and secondary school teachers residing in the City of St. Louis and St. Louis County 2,997 (15.4%) are black. Of the 15,060 St. Louis County school teachers, 957 (6.34%) are black.

The District received approximately 5,700 teacher employment applications for the school terms of 1968–1969 through 1973–1974. Very few of these applications were shown to have been made by blacks. The United States offered in evidence the applications of fifty-three blacks, who applied during this period of time, for comparision with those whites who received positions.

For the 1967–1968 school year the District hired 23 teachers; for the 1968–1969 school year 36 teachers; for the 1969–1970 school year 31 teachers; for the 1970–1971 school year 27 teachers; for the 1971–1972 school year 30 teachers; for the 1972–1973 school year 21 teachers; and for the 1973–1974 school year 13 teachers.

The District has never employed a personnel director. The District's Board of Education hires teachers with the advice of the Superintendent, the Assistant Superintendents, and the principals of The schools. The pool of applicants from which the District hires teachers is obtained through personal recruitment, po-

sition vacancy notices, and unsolicited applications.

## RECRUITMENT

District principals and administrators maintain personal contact with, and occasionally visit, colleges and universities for the purpose of interesting prospective teachers in employment with the District. Usually they visit the institutions at which they themselves studied. These recruitment contacts were never shown to be the specific cause of a substantial number of applications. Rather, the contacts were maintained for the primary purpose of filling teacher vacancies on short notice in emergency situations. In recent years, due to the great number of teacher applications and the comparatively small number of teacher vacancies, the District has relied little on the recruitment visits. In 1973 no recruitment visits were made at all.

## POSITION VACANCY NOTICES

Notices that certain District teaching positions are vacant are mailed by the District to 150–200 randomly selected colleges and universities and to some independent agencies. The mailing list of these institutions used by the District until the Spring of 1973 contained only one college with more than 40% black enrollment. This list was a random selection of colleges and universities from the rolls of the National Council of Accredited Teachers Association. These institutions were evaluated and found to meet certain standards in teacher training. The institutions on the District's list were also selected to achieve a representative coverage of the various geographic regions of the country. At the behest of the United States the District expanded this vacancy notice list. The Superintendent intended that the new list include all the colleges, including black colleges, in Missouri and in the surrounding states. The job of

---

2. This Area includes the Missouri counties of Franklin, Jefferson, St. Charles and St. Louis; the City of St. Louis; and the Illinois counties of Madison and St. Clair.

revising this list was given to the District's Guidance Department. However, the United States offered evidence that certain schools which have more than 95% black enrollment and which are located in states geographically contiguous to Missouri were not included on the revised list. The United States neglected to show, however, that the schools it suggested should have been on this mailing list actually had education departments which could serve as sources of potential teachers. No racially intended or oriented recruiting by the District has been shown. The District has not recruited whites while failing to recruit blacks, as the United States has alleged.

## PROCESSING OF APPLICATIONS

Until 1959 the District's teacher application forms required the designation of each applicant's race. In 1959 this designation was deleted from the form. Until 1972 a space for the applicant's photograph was provided on the form. However, the submission of a photograph was optional with the applicant.

Application forms received by the District are maintained in its central office. The applications are divided into two general groups, those seeking positions in the elementary schools and those seeking positions in the secondary schools. The secondary school applications are further indexed by curriculum topic.

Most of the teacher applications are received, and teachers are selected for positions, in the spring and early summer of each year. Teachers are usually hired for the Fall term next following the filing of their applications. On occasion teachers have been hired for mid-year vacancies.

■ The applications received prior to the teacher selections for the following term are placed in the "current" files. Those applications not selected for the following term are put into "inactive" files and are not considered for vacancies in succeeding terms unless the applicants specifically request that their applications be maintained in the "current" files. It is commonly known that teacher applicants often simultaneously apply for positions to a large number of school districts.[3] The Jennings District administrators reasonably believe the likelihood to be small that applicants from preceding years would be interested in having their applications continually maintained in the "current" files. It is probable that applicants have found positions with other districts. Furthermore, in light of the district's limited finances, moderate size, and large number of applications, its practice of not maintaining all applications continuously in the "current" files is reasonable.

Not all of the applications in the appropriate current files are considered when a teaching position is to be filled. Either the principal of the school in which the vacancy occurs or an assistant superintendent of the District selects a usually small number (5–10) of applications at random from the appropriate current files and reviews them. From these applications are selected those applicants who appear to meet the qualifications of the vacant position. At this point an applicant's credentials may be requested from his educational institution or the applicant may be immediately called in for personal interview with the principal or other administrator. The principal thereafter recommends one or more applicants to the Superintendent and Assistant Superintendent who also interview them. When the principal, the Superintendent and the Assistant Superintendent agree on an applicant, the Superintendent recommends this applicant to the Board of Education personnel committee for hiring. The full Board of Education then must approve the employment.

---

3. For example, Sandra Reid, a black teacher applicant, on March 7, 1973, filed an application with both the Jennings District and the Hazelwood School District. *See United States v. Hazelwood School District*, 392 F. Supp. 1276, 1284. (E.D.Mo.1975).

No formal written standards or guidelines have been promulgated by the Board for the selection or hiring of teachers. However, the District administrator, whose responsibility it is to screen and recommend teacher applicants, convinced the Court that their chief concern is that the District hire the best qualified applicants for the open positions without regard to race, color or religion. Other valid considerations of the District's administrators for hiring teachers include the applicants' previous experience with children, the need for a school staff balanced with regard to teachers' ages and sexes, and qualifications for the specific vacancies.

Preference in hiring for regular teaching positions is given to the District's substitute teachers, former teachers and student teachers, whose abilities have been tested in the classroom and are known to the District. The applications of such persons are not compared with those of applicants who have not previously taught at the District.

The District does not determine which college students will student teach there. They are selected by the sponsoring institutions. No inquiry is made by the District as to the race or color of those sent to it.

The United States offered evidence of overt racial discrimination. Deanna Slone, a white kindergarten teacher with the District, testified that in 1972 she had occasion to supervise Lamonia Jones, a black student teacher. Mrs. Slone's principal, Mr. Scott, advised her that, although Mrs. Jones was qualified as a teacher, she should not be encouraged to apply for a position with the District. The reason he gave for this was that, although the faculty would accept Mrs. Jones, the community would not because of her color. Mrs. Slone testified that she did not encourage Mrs. Jones to apply. Nevertheless, Mrs. Jones was hired by the District the following year as a kindergarten teacher.

Other evidence of alleged racial discrimination was offered by the United States. In 1960 Mrs. Elizabeth Botts, a white woman, wrote the District enquiring about a teaching position. A document discovered in the District's files captioned "Possible Applicants for Teacher Vacancies" lists her name and address at the time of her letter. The postal zone of her address is circled and the following handwritten statement appears: "Am afraid she is colored??". Her address at that time was in a neighborhood experiencing an increase in black residents. Mrs. Botts was never interviewed or offered a position by the District.

Evidence was offered that in the Summer of 1961 Mrs. Marie O'Kain, a black woman, telephoned the District enquiring about elementary teacher employment. She was informed that a position was open and was invited in for an interview with a school principal. She was not available to interview immediately so she mailed an application to the District with her photograph attached. After the District had not responded for several days, she telephoned the District's office again enquiring about the position. She was told the position was still open. When she asked about her application she then was advised that the position had recently been filled. She hung up, called back giving another name, and enquired about the position. Then she was advised that the position was open.

Mrs. O'Kain further testified that the reputation of the District among black teachers is that the District practices racial discrimination. However, she could identify by name only two black teachers who told her this. The Court, as the trier of fact, finds her testimony regarding the District's reputation incredible.

In November, 1973, the principal and teachers of the District's Fairview High School requested that the District hire black teachers for the school. The Superintendent advised them that the hiring of personnel was an administrative matter and not their responsibility.

■ The United States offered in evidence, in both oral testimony and documentary form, a comparison of the qualifications of black applicants, who were not hired by the District, with the white applicants who were hired. The purpose of this evidence was to show that the black applicants were as qualified as, or more qualified than, the whites hired. There was no evidence that these applicants were not chosen for initial consideration or, if they were considered, were disqualified on account of their race. Furthermore, there was evidence that certain of the black applicants did not submit completed application forms, did not appear for scheduled interviews, or did not possess the requisite subject matter qualifications. Very often the proffered comparisons were between black applicants and whites hired in school years later than the years for which the blacks applied. Such comparisons are irrelevant to the issue of discrimination.

■ Both the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964 prohibit the selection of public school teachers on the basis of race. *Wall v. Stanley County Board of Education*, 378 F.2d 275, 276 (4th Cir. 1967); *United States v. Chesterfield County School District*, 484 F.2d 70, 73 (4th Cir. 1973); *Cf., Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

■ Plaintiff United States asserts that the employment statistics of the District raise an inference of racial discrimination on the part of the defendants. The Court disagrees. It is axiomatic that each case of this type must be decided upon its own peculiar facts. *Brooks v. School District of Moberly, Missouri*, 267 F.2d 733, 736 (8th Cir. 1959), *cert. den.*, 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959); *Walton v. Nashville, Ark., Special School District No. 1*, 401 F.2d 137, 143 (8th Cir. 1968). The record of this case shows that in recent years the Jennings District, as did other districts, received a large number of unsolicited applications for teaching positions. After an extensive effort was made by the United States to identify the race of the applicants, less than 1% of the applicants were shown to be black. It is inappropriate to utilize a statistical approach to construct an inference or *prima facie* case of racial discrimination where the pool of applications for teaching positions included so few blacks. The United States has not shown the Court that the District's reputation discouraged blacks from filing applications.

In *Jackson v. Wheatley School District*, 430 F.2d 1359, *at* 1363 (8th Cir. 1970), the Court of Appeals noted that evidence supporting racial discrimination included "evidence that the ratio of Negroes on the faculty to whites [did] not remotely approach the proportion of Negro students to white students . . . .". In the instant action very few black students enrolled with the District until the 1972–1973 school year. During that year the District began hiring black teachers.

■ The United States asserts that the hiring practices of the District perpetuate the effects of the District's history of being a dual school system. The Court cannot find or conclude from the record that this school district conducted to any substantial degree educational systems for blacks and for whites. The only incident of a dual system existed in the 1925–1926 school year when three black students were transferred to a black school in another district. Such an example does not even approach the magnitude of the dual systems of education that have been the subjects of desegregation suits and which have prompted Courts to require the defendants to demonstrate that their actions were not racially discriminatory. *See, e. g., Keyes v. School District No. 1*, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Chambers v. Hendersonville Board of Education*, 364 F.2d 189 (4th Cir. 1966).

Plaintiff next argues that the hiring practices of the District have a racially discriminatory impact. The hiring practice of the District which has been shown to have the greatest numerical impact is the initial selection at random of a small number of applications from the "current" files. With this random selection the majority of applications are rejected. To argue that the greatest impact of this practice falls adversely on blacks overlooks the fact that many more whites were rejected by this practice than blacks. The Court concludes that plaintiff has failed by its proof to shift to the District the burden of showing that race was no factor in its hiring practices. *See Haney v. County Board of Education of Sevier County*, 429 F.2d 364, 371 (8th Cir. 1970).

The United States has failed to prove the existence of a pattern or practice of racial discrimination. The evidence of overt discrimination is unpersuasive. In spite of Principal Scott's initial position regarding the hiring of Mrs. Lamonia Jones, Mrs. Jones was ultimately hired by the District. The reaction of the District Superintendent to the suggestion of the Fairview High School faculty that the hiring of personnel, black or white, was an administrative matter and not their concern was an eminently reasonable reaction and without implication of racial discrimination. Other incidents of discriminatory acts, *e. g.* regarding the notation on the Botts' application and the O'Kain telephone conversations were separated in time and do not indicate a pattern or practice of discrimination. They were no more than isolated events. *United States v. Ironworkers Local 86*, 443 F.2d 544, 552 (9th Cir. 1971), *cert. den.*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

Regarding the use of subjective employment criteria, the Court concludes, consistent with the teaching of the Eighth Circuit in *Smith v. Board of Education of Morrilton School District No. 32*, 365 F.2d 770 (8th Cir. 1966), that the District's criterion of hiring the best qualified applicant for the particular vacant position is not racially discriminatory. *See Brooks v. School District of Moberly, Missouri*, 267 F.2d 733 (8th Cir. 1959). Implied in this criterion are the minimum standards of the State of Missouri for teaching positions. Although this criterion was not formally promulgated by the Board of Education, it was foremost in the minds of those administrators who recommended applicants to the Board. Such a criterion is not other than what an applicant might expect. The fact that this criterion is enforced by the District's administrators who must justify a recommendation to the Board is evidence that the ultimate hiring decision is not arbitrarily or capriciously made. The expert testimony offered by the United States only buttresses this conclusion, in the Court's estimate.

Dr. R. Oliver Gibson testified for the United States as an educational expert concerning the need for hiring guidelines promulgated by the Board and concerning the procedural steps implicit in the hiring process, i. e. recruitment, screening, interviewing, and hiring or placing. After testifying that he felt the District's hiring procedures did not comport with its implicit goal of selecting the best teachers available, he further testified that (a) the selection of teachers from those who were student teachers was not an improper selection method, as long as better qualified applicants were not overlooked; (b) the formality of the hiring process often must be accommodated to the district's size and financial resources; (c) he did not analyze the District's teachers to determine whether they were as qualified as the black applicants; (d) the hiring process should be one that gives a *"reasonable probability"* that the best teachers would be identified; (e) his opinions were not meant to condemn the District's procedures *because he did not study the results of these procedures;*

and (f) it is normal for a district to desire a teaching staff that reflects the makeup of the population from which the students come. When applied to the District's general hiring procedures, his testimony lends support to the Court's belief that the District's procedures were reasonable and were infused with a business purpose.

Roy Olive, a Jennings assistant superintendent for elementary education from 1964 through 1971, testified that the reason the District did not evaluate all available applications for a specific opening was that such a procedure, and the expense it would require, would be unreasonable. To properly evaluate *all* applicants requires interviewing and detailed discussion by the administrators. The District has neither the financial resources nor the requisite administrative time to evaluate all applicants. The Court considers Mr. Olive an expert in education administration. The Court credits his testimony as support for the reasonableness of the District's hiring procedures, given the small number of vacancies in any year, the large number of applications on file, and the moderate size of the District.

 This is not an action litigating the employment rights of black public school teachers who were discharged in the implementation of a program of school desegregation and consolidation. In such actions the qualifications of such teachers must be compared with the qualifications of *all* other teachers in the system. *Brooks, supra; Wall, supra; Chambers v. Hendersonville Board of Education,* 364 F.2d 189 (4th Cir. 1966); *United States v. Jefferson County Board of Education,* 380 F.2d 385 (5th Cir. 1967), *cert. den.,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), *reh. den.* 389 U.S. 965, 88 S.Ct. 324, 19 L.Ed.2d 382 (1967); *Stell v. Board of Public Education,* 387 F.2d 486 (5th Cir. 1967); *Rolfe v. County Board of Education,* 391 F.2d 77 (6th Cir. 1968). Rather, this is an action wherein the United States failed to prove that the present policies of the District either continued the effect of past discrimination or presently discriminated against black teacher applicants on the basis of race.

In consequence, judgment will be for the defendants.